IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEITH SANTANGELO, | ) |
| | ) |
| Plaintiff, | ) 15-cv-0293 |
| | ) |
| v. | ) Judge John Z. Lee |
| | ) |
| COMCAST CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

When Plaintiff Keith Santangelo contacted Defendant Comcast Corporation ("Comcast") to inquire about obtaining internet services, the Comcast representative informed him that Comcast needed to obtain Santangelo's credit score in order to ensure that he qualified. The representative also told him that he could forego the credit check if he simply paid a $50 deposit. Santangelo agreed and paid $50 with a credit card. As it turns out, Comcast pulled his credit anyway, and Santangelo's credit score went down by six points that day. As a result, Santangelo filed this lawsuit, alleging that Comcast violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505. Santangelo also claims that Comcast breached their agreement and was unjustly enriched when it obtained Santangelo's credit score.

Comcast now moves for summary judgment as to all of Santangelo's claims. In response, Santangelo has filed his own motion seeking summary judgment as to his

FCRA claim. For the reasons stated herein, each party's motion is granted in part and denied in part.

## Factual Background[1]

Santangelo contacted Comcast on December 3, 2014, to inquire about obtaining internet service for his apartment. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 23, 24, ECF No. 224. Comcast's representative asked Santangelo for permission to do a credit check, *id.* ¶ 25, and Santangelo asked if there was an alternative available, such as providing a refundable deposit, *id.* ¶ 26. The representative told Santangelo that, to avoid a credit check, Santangelo could instead pay a $50 deposit via credit card online. *Id.* ¶ 27; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 9, ECF No. 228-2. This was in accordance with a policy in place at the time in Comcast's Greater Chicago Region, which required a $50 deposit if consumers did not want their credit checked or if they failed a credit check. Pl.'s LR 56.1(a)(3) Stmt. ¶ 13; Def.'s Ex. 11, R. Sanfelice Dep. at 50:1–7, ECF No. 228-14; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 3.

Santangelo agreed to pay the $50 deposit, Pl.'s LR 56.1(a)(3) Stmt. ¶ 28. He then submitted his credit card information for the deposit via the online link that the representative provided and informed the representative that he had done so. *Id.* ¶ 30. However, the representative failed to uncheck a box on his computer screen that, by default, sent a credit-check request to Equifax whenever a representative clicked "Apply." Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 14, 15, 32; Pl.'s Ex. 6 at 3, ECF No. 224-

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

6. As a result, just one minute after Santangelo informed the representative that he had submitted his credit-card payment information, Comcast initiated a credit check with Equifax. Pl.'s LR 56.1(a)(3) Stmt. ¶ 31; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 11. The representative quickly received a result message, "Passed / Proceed with Order," Pl.'s LR 56.1(a)(3) Stmt. ¶ 31, and Comcast received Santangelo's TELCO credit result from Equifax. *Id.* ¶ 33.[2]

Two minutes later, the representative asked Santangelo to resubmit his credit-card information for the $50 deposit. Pl.'s LR 56.1(a)(3) Stmt. ¶ 36; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 12. Santangelo did so and advised the representative of the same. Pl.'s LR 56.1(a)(3) Stmt. ¶ 37. The representative then offered Santangelo an internet service package, *id.* ¶ 38, which Santangelo proceeded to order, Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 13.

Santangelo's credit score dropped by six points on December 3, 2014, the same day that Comcast initiated the credit check with Equifax. Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 31. And Comcast's credit-check policy advises its representatives that "every time credit is checked by Comcast it becomes a permanent part of the customer's credit history and can lower their credit rating." Pl.'s LR 56.1(a)(3) Stmt. ¶ 43.

Santangelo's credit report does not reflect any other credit inquiries on December 3 or 4, Def.'s Ex. 9 at 7, ECF No. 228-12. That said, Capital One, Inc. and

---

[2]   "TELCO" refers to a type of credit product provided by Equifax that is specific to the telecommunications industry. *See* Pl.'s Mem. Supp. at 6, ECF No. 223; *see also* www.equifax.com/business/ telecommunications-risk-score (last referenced Sept. 14, 2018).

Intuit Inc. each made a credit inquiry in the days immediately prior to December 3, Def.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 4, 7.

Soon after discovering that his credit score had dropped, Santangelo called Comcast to complain. Pl.'s LR 56.1(a)(3) Stmt. ¶ 44. Santangelo spoke with a different representative, who confirmed that Comcast, in fact, had requested his credit information. *Id.* ¶ 46. Santangelo asked to speak with a supervisor, who told him that she could not reinstate the points to his Equifax credit score. *Id.* ¶ 49. However, she offered to "try to" transfer him to the collections department "to see if they are actually able to do something." *Id.* But she cautioned that she "will not be able to guarantee that the taking out of the points will be fixed." *Id.* Hearing this, Santangelo hung up the phone. *Id.* ¶ 50; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 16.

Approximately seven months later, in June 2015, Comcast credited Santangelo $50.10 for his deposit and accrued interest. Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 22. That same month, Comcast caused the credit inquiry it had made to be "masked."[3] *Id.* ¶¶ 33, 34. A few months later, Comcast credited Santangelo with another $50.18. *Id.* ¶ 24.

Based on these events, Santangelo claims that Comcast violated the FCRA by obtaining his credit information from Equifax without a permissible purpose (Count I). Am. Compl. at 8, ECF No. 37. Santangelo also claims that, by obtaining his credit information despite agreeing not do so, Comcast violated the ICFA (Count II),

---

[3] The parties agree that "masking" results in "no one outside the consumer being able to view the inquiry in question," Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 34, but neither has clarified what effect, if any, this may have on Santangelo's credit score.

4

breached their contract (Count III), and was unjustly enriched (Count IV). Am. Compl. at 9–12.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). The Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

Moreover, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Khan v. Midwestern Univ.*, 879 F.3d 838, 840–41 (7th Cir. 2018) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See Celotex,* 477 U.S. at 322. Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *See id.* at 321–22.

## Analysis

Comcast contends that Santangelo lacks Article III standing to pursue his claims. It also argues that there is no material dispute of fact that would allow his claims to survive summary judgment and, alternatively, that Santangelo has waived his claims. For his part, Santangelo seeks summary judgment as to his FCRA claim.

### I. Article III Standing

To have Article III standing to sustain a lawsuit in federal court, a plaintiff must demonstrate "(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992) (Blackmun, J., dissenting) (internal quotation marks omitted). At summary judgment, a plaintiff "need show only a 'genuine issue' of material fact as to standing." *Id.* (citing Fed. R. Civ. P. 56(c)). "This is not a heavy burden." *Id.*

Here, Comcast argues that Santangelo's lowered credit score does not satisfy Article III's injury-in-fact requirement with respect to his FCRA claim, because he

has not shown that he was denied a loan, a purchase, or a credit application.[4] Def.'s Mem. Supp. at 6, ECF No. 228-1. In support, Comcast cites to a district-court decision from outside this circuit. *See Gallaher v. US Bank Nat'l Assoc.*, No. CIV.A. 3:14-cv-1877, 2017 WL 2111593 (D. Conn. May 15, 2017).

Comcast is mistaken. That Santangelo was not harmed in the specific ways suggested by Comcast does not mean that Santangelo did not face other injury, such as the prospect of less favorable credit terms. The Seventh Circuit recently affirmed that it is "very easy" to envision a lowered credit score creating a real risk of financial or other harm that satisfies the injury-in-fact requirement. *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 344–46 (7th Cir. 2018) (finding that the plaintiff's inaccurately low credit score was sufficient to confer standing at summary judgment). As the court stated in *Evans*, a lower score has "a variety of negative effects. For instance, it is 'a red flag to the debtor's other creditors and anyone who runs a background or credit check, including landlords and employers.'" *Id.* at 345 (quoting *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1082 (7th Cir. 2013)).

Comcast also contends that its conduct was not fairly traceable to the six-point reduction in Santangelo's credit score on the day it checked his credit.[5] Def.'s Reply

---

[4] Comcast also contends that Santangelo's failure to provide any evidence of "actual damages" also precludes him from establishing an injury-in-fact. But as the Court has previously explained, *see Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691, 697 (N.D. Ill. 2016), actual damages and injury in fact "are not the same thing." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013).

[5] Although arguments made for the first time in a reply brief are normally deemed waived, the Court considers this argument because it bears on the Court's subject matter jurisdiction.

at 2, ECF No. 239. As Comcast sees it, because Capital One and Intuit also had checked Santangelo's credit just days before, there is no evidence that Comcast alone was responsible for the reduction. *Id.* It is undisputed, however, that Santangelo's score dropped by six points on the same day that Comcast initiated the inquiry, Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 31, and that there were no other credit inquiries on that day. Moreover, as Comcast itself warns its representatives, credit inquiries have the potential to negatively impact credit scores. Pl.'s LR 56.1(a)(3) Stmt. ¶ 43. From these facts, a jury could reasonably conclude that Comcast's conduct was fairly traceable to some or all of the decrease in Santangelo's credit score.

Relatedly, Comcast also argues that it refunded the $50 payment (plus interest) to Santangelo, thereby effectively mooting his claims. "Mootness is 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Laskowski v. Spellings*, 546 F.3d 822, 824 (7th Cir. 2008) (quoting *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.*, 528 U.S. 167, 189 (2000)). Although Comcast's repayment of the deposit does undercut several of Santangelo's claims (as will be discussed below), it does nothing to remedy the decline in Santangelo's credit score and the associated risk of injury.

Accordingly, the Court concludes that Santangelo has sufficiently established Article III standing.

## II. State Law Claims (Counts II–IV)

Comcast also seeks summary judgment as to Santangelo's claims pursuant to the ICFA (Count II), for breach of contract (Count III), and for unjust enrichment (Count IV), arguing that Santangelo has not adduced evidence of actual damages. In response, Santangelo effectively concedes the point, but contends that this does not foreclose his claims for punitive damages and injunctive relief. Pl.'s Resp. at 6, ECF No. 235.

### A. ICFA Claim (Count II)

"[A]n action brought under the ICFA requires the plaintiff to show he suffered 'actual damage' as a result of the defendant's violation of the act." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (citing 815 Ill. Comp. Stat. 505/10a). And, contrary to Santangelo's contention, a plaintiff is not entitled to injunctive relief absent a showing of actual damages. *Id.* at 740 (citing *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 76 F. Supp. 2d 868, 873 (N.D. Ill. 1999)). The same is true for punitive damages. *U.S. ex rel. Pileco, Inc. v. Slurry Sys., Inc.*, 804 F.3d 889, 892 (7th Cir. 2015). Therefore, given Santangelo's failure to offer any evidence of actual damages, Comcast is entitled to summary judgment as to Count II.

### B. Breach-of-Contract Claim (Count III)

Likewise, under Illinois law, a plaintiff must prove actual damages to prevail on a claim for breach of contract.[6] *See TAS Distrib. Co. v. Cummins Engine Co.*, 491

---

[6] The parties agree that Illinois law applies to Santangelo's state-law claims.

9

F.3d 625, 632 (7th Cir. 2007). Because Santangelo has chosen to forgo actual damages, Comcast is entitled to summary judgment as to Count III.

### C. Unjust-Enrichment Claim (Count IV)

In his unjust-enrichment claim, Santangelo seeks the return of his $50 deposit, disgorgement, and punitive damages. Am. Compl. at 12; Pl.'s Resp. at 17. But it is undisputed that Comcast refunded Santangelo's deposit, Def.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 22, 24, and Santangelo has not argued that this is insufficient restitution or disgorgement. Moreover, providing full restitution to a plaintiff moots an unjust-enrichment claim under Illinois law, *Gates v. City of Chicago*, 623 F.3d 389, 412–13 (7th Cir. 2010), including a claim for punitive damages, *see Cleary v. Philip Morris Inc.*, 656 F.3d 511, 520 (7th Cir. 2011) ("Unjust enrichment is not a mode of imposing punitive damages."). Comcast is therefore entitled to summary judgment as to Count IV.

### III. FCRA Claim (Count I)

Under the FCRA, a "person shall not use or obtain a consumer report for any purpose unless . . . [it] is obtained for a purpose for which [it] is authorized to be furnished under this section." 15 U.S.C. § 1681b(f)(1). The parties raise two issues in their summary-judgment motions. First, the parties dispute whether Comcast had a "legitimate business need" to obtain Santangelo's TELCO score as permitted by § 1681b(a)(3)(F)(i). Second, the parties disagree as to whether Comcast's actions in obtaining the TELCO score were willful under § 1681n(a)(1)(A).

### A. Legitimate Business Need

According to Santangelo, there is no evidence that Comcast had a "legitimate business need" to check his TELCO score. Pl.'s Mem. Supp. at 7–12. As Santangelo sees it, this is because Comcast had a policy of offering consumers its services without requiring a credit check—provided that a $50 deposit payment was made. *Id*. at 9.

For its part, Comcast contends that it had a legitimate need for Santangelo's TELCO credit information because it "obtained [it] to evaluate his eligibility for service" and to verify his identity. Def.'s Mem. Supp. at 8–10. But this is unsupported by the record. There is no dispute that Comcast offered to provide Santangelo internet service without obtaining his TELCO information, if he paid a $50 deposit. And no reasonable jury could conclude that Comcast needed Santangelo's credit score to determine his eligibility for service when Comcast's own policies and representations to Santangelo indicated otherwise. *See, e.g., Ali v. Vikar Mgmt. Ltd.*, 994 F. Supp. 492, 499 (S.D.N.Y. 1998) (holding that no reasonable jury could conclude that a landlord had a legitimate need for a tenant's credit report when the tenant was allowed to renew the lease without regard to credit score); *Hernandez v. Lamboy Furniture, Inc.*, No. CIV.A. 07-00240, 2008 WL 4061344, at *6 (E.D. Pa. Sept. 2, 2008) (defendant business lacked actual evidence that it needed consumer report). Furthermore, Comcast did not need Santangelo's TELCO information to confirm his identify, because it used another Equifax product, Positive ID, to do just that. Pl.'s LR 56.1(a)(3) Stmt. ¶ 21.

11

Comcast also argues that "the legitimacy of a business need does not hinge on having a consumer's consent." Def.'s Mem. Supp. at 8. This is true enough, but it is beside the point. It is not Santangelo's lack of consent that demonstrates Comcast's lack of a legitimate business need. Rather, it is Comcast's own practice of foregoing a credit check if a potential subscriber agrees to pay the $50 deposit, as Santangelo did. *See Santangelo,* 162 F. Supp. 3d at 698–99.

Undeterred, Comcast contends that its credit inquiry was legitimate because Santangelo's payment of the $50 deposit did not eliminate the ongoing credit risk Santangelo posed to Comcast. Def.'s Mem. Supp. at 9. According to Comcast, this is because the total cost of services used by Santangelo in the coming months could exceed $50. *Id*. This is a puzzling argument. If accepted, it would allow Comcast and other subscription-based service providers to pull a consumer's credit score whenever there was a possibility (however remote) that the subscriber would continue to use the services beyond the time covered by the deposit amount. For Comcast, and providers with similar monthly subscription payment models, this would mean that it could effectively pull a consumer's credit score at will.

In any event, the argument is not supported by evidence. First, there is no evidence that Comcast even considered this possibility for Santangelo or any other subscriber. Nor has it provided any evidence that it ever initiated a credit inquiry for a current subscriber because it feared that the deposit that it had required was somehow insufficient. One could imagine, for example, that Comcast might request credit checks of a subscriber on an ongoing basis to consider revoking its services or

12

altering its terms as its prices and packages changed, but again Comcast has provided absolutely no evidence of this.

Finally, Comcast states in passing that Santangelo authorized a credit check pursuant to its Subscriber Agreement. Def.'s Mem. Supp. at 10. It is wholly unclear what this has to do with a legitimate business need. Perhaps Comcast means to suggest that Santangelo retroactively consented to the credit check when he agreed to the Subscriber Agreement, *see* Def.'s Mem. Supp. at 15 (making this argument with regard to its breach-of-contract claim). If so, it is true that one of the authorized purposes for obtaining a consumer report under the FCRA is that it is done "in accordance with the written instructions of the consumer to whom it relates." 15 U.S.C. § 1681b(a)(2). And some district courts have found that authorization in a contract constitutes a consumer's "written instructions." *See, e.g., LeBlanc v. Allstate Ins. Co.*, No. CIV.A. 99-2724, 2000 WL 687900, at *3 (E.D. La. May 17, 2000).

But Comcast does not mention § 1681b(a)(2) or further develop the argument, thereby waiving it. *See Godbole v. Ries*, No. 15 C 5191, 2017 WL 219506, at *2 (N.D. Ill. Jan. 19, 2017) ("The Court is not required to construct arguments for [parties].") (citing *Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*, 771 F.3d 980, 987 (7th Cir. 2014)). In any event, the Subscriber Agreement appears to be a standard one, and under Comcast's theory, every customer who becomes a subscriber has retroactively agreed to a credit check, even when he or she paid a $50 deposit to Comcast in exchange for Comcast's promise that it would not initiate one. It also is worth pointing out that, when Comcast and a future customer agree that Comcast

13

will take a $50 deposit in lieu of conducting a credit check, the individual is only a *potential* subscriber, who has not even been provided a subscription agreement to review.[7] Comcast points to no evidence or case authority that would support such a strained argument.

For these reasons, Santangelo is entitled to summary judgment that Comcast violated 15 U.S.C. § 1681b(f)(1), because it did not have a "legitimate business need" for Santangelo's credit information as required by § 1681b(a)(3)(F).

## IV. Whether Comcast Willfully Violated the FCRA

Both parties also move for summary judgment as to whether Comcast willfully failed to comply with the FCRA. Because Santangelo does not seek actual damages, he must prove that Comcast "willfully fail[ed] to comply" with the FCRA to be entitled to any relief, including statutory or punitive damages, as well as reasonable attorney's fees. 15 U.S.C. § 1681n(a)(1)(A). Willfulness in this context means either that Comcast acted knowing that its conduct violated the FCRA or with reckless disregard of the FCRA's requirements. *Safeco Ins. Co. v. Burr,* 551 U.S. 47, 57 (2007). In order for one's actions to be reckless, the actions must entail "an unjustifiably high

---

[7] The Subscriber Agreement provides that the subscriber "authorize[s] Comcast to make inquiries and to receive information about your credit experience from others." Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 28. But Santangelo did not receive a copy of the agreement from Comcast until *after* he had paid the $50 with the understanding that Comcast would not check his credit. Comcast claims that Santangelo "had access to the Subscriber Agreement that same day," Def.'s Reply at 12, but none of the sales representative's statements upon which Comcast relies supports the contention that Santangelo was informed that he could review a copy of the Subscriber Agreement before making the $50 deposit.

14

risk of harm that is either known or so obvious that it should be known." *Id.* at 68–69 (internal quotations and citations omitted).

Comcast contends that, when its representative initiated a credit check on Santangelo, it was simply an unfortunate, human error. In support, Comcast points to its written policy of allowing those who pay a $50 deposit to avoid a credit inquiry, as well as its training and ongoing communications to representatives regarding this policy. Def.'s Mem. Supp. at 12. For example, a training manual instructed representatives to uncheck the default-checked box in the customer software that would otherwise initiate a credit inquiry with Equifax. Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 11.

To support its position, Comcast also points to *Newlin v. Comcast Cable of Ind., Inc.*, No. 2:12-CV-430-TLS, 2015 WL 363426 (N.D. Ind. Jan. 27, 2015). In that case, like here, Comcast pulled the plaintiff Newlin's credit score from Equifax despite the plaintiff having paid Comcast a $50 deposit. *Id.* at *1. After a bench trial, the court found that Comcast did not "knowingly and intentionally" ignore Newlin's desire to avoid a credit check. Salient for our purposes, the court based its determination on Newlin's failure to "present any evidence that Comcast had a deliberate policy of ignoring consumer requests pertaining to credit reports, or a deliberate practice of ignoring its own policy with respect to the deposits, or that it was aware of problems with its system but took no remedial action." *Id.* at *4.

For his part, Santangelo points out that, unlike Newlin, he has presented evidence that Comcast was aware of problems with its system, but did nothing to

15

remedy it. For this, Santangelo points to the *Newlin* litigation, which was brought in 2012 and, by December 2014, was nearly finished, with the court issuing its decision the month after the events at issue here. In addition, Santangelo cites to complaints sent to Comcast about the same conduct in 2012 and 2013. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6, ECF No. 234. In response, Comcast argues that the complaints were few and far between and that, rather than supporting Santangelo's argument, *Newlin* exonerated Comcast.[8] Def.'s Reply at 9.

Both are correct to some extent. There is evidence in the record from which a jury could reasonably conclude that the Comcast representative who initiated the credit check did so in error. But, there is other evidence from which a reasonable jury could conclude that Comcast knew or should have known that it would likely happen based upon prior experiences with similar incidents.

Additionally, Comcast contends that it did not know, and could not reasonably have known, that pulling Santangelo's credit score would violate the FCRA "because we're entering into a business transaction, we have the right to run risk." Def.'s Mem. Supp. at 11. But, as Santangelo points out, there is no evidence in the record that Comcast needed the TELCO score from Santangelo for any such purpose. Of course, Comcast might have enjoyed having Santangelo's credit information notwithstanding their policy. But this is not enough. To obtain or furnish credit information, one must have an authorized purpose. *See Safeco*, 551 U.S. at 59.

---

[8] Comcast also objects to the admissibility of the third-party complaints as hearsay, Def.'s Reply at 10, but these statements are offered, not for their truth, but for their impact on Comcast's knowledge and state of mind.

Comcast also states that it reasonably interpreted the FCRA because its Subscriber Agreement gave it express consent to pull Santangelo's credit report notwithstanding any prior agreement or representations to the contrary. Def.'s Mem. Supp. at 10–11. But, as noted above, not only is this argument insufficiently developed and thus waived, *see Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived."), but it is not supported by the record.

Moreover, Comcast admits that, in 2012 and 2013, prior to the events at issue here, it had attempted to fix the credit scores of other consumers who complained about similar conduct. Def.'s Resp. Pl.'s 56.1(b)(3)(C) Stmt. ¶ 6, ECF No. 239-3. But this is a dual- edged sword. On the one hand, a reasonable jury could infer from these actions that Comcast believed it had remedied a fairly isolated problem. On the other, a reasonable jury could infer that Comcast realized the risk of an unauthorized credit check and the illegality of such conduct as far back as 2012 or 2013.

When the record is viewed in its entirety, there is a genuine dispute as to whether Comcast knew or should have known that it was violating the FCRA in December 2014 when its representative caused a credit check to be performed on Santangelo even though he and Santangelo had agreed to the contrary. As such, whether Comcast's violation of the FCRA was willful must be resolved by the jury.

### V. Waiver and Mootness

Lastly, Comcast seeks summary judgment on the basis of what it calls "waiver." *See Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133,

17

1140 (7th Cir. 2009) (stating that "waiver is the voluntary and intentional relinquishment of a known right"). It also argues that Santangelo's claims are moot because, as Comcast sees it, he caused the injury to himself. Def.'s Mem. Supp. at 18 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *Chapman v. First Index, Inc.*, 796 F.3d 783, 787 (7th Cir. 2015)).

Specifically, Comcast claims that it immediately offered to "mask" Santangelo's credit score and to pay back the $50 deposit, but that he refused the offer. Def.'s Mem. Supp. at 18–19. But this is not what the evidence shows. Rather, it is undisputed that Comcast's representative told Santangelo that she could not fix the drop in his credit score. She also said that she could transfer him to someone else who might be able to fix it, but could not guarantee it. Pl.'s LR 56.1(a)(3) Stmt. ¶ 49. Only then did he hang up the phone with Comcast. *Id.* ¶ 50. While it is true that Comcast returned the $50 deposit and interest, it is not entirely clear whether Comcast remedied the decline in Santangelo's credit rating, or how it might have done so. Accordingly, Comcast's motion for summary judgment as to the FRCA claim on this basis also is denied.

## Conclusion

For the reasons stated herein, Plaintiff's motion for summary judgment [223] and Defendant's motion for summary judgment [228] are granted in part and denied in part. Comcast's motion is granted as to Santangelo's state-law claims (Counts II through IV) and denied as to his FCRA claim (Count I). Santangelo's motion is granted as to his FCRA claim (Count I) insofar as the Court concludes that Comcast

18

had no legitimate business purpose to check his credit; it is denied in all other respects. The only remaining issue for trial is whether Comcast violated the FCRA willfully. This case is set for status hearing on 10/3/18 at 9:00 a.m. The parties should be prepared at the hearing to set a schedule for pretrial filings and a date for the pretrial conference and trial.

**IT IS SO ORDERED.**  ENTERED 9/17/18

_____
**John Z. Lee**
**United States District Judge**